Grafton,
Nov. 7, 1933.

## American Motorists Insurance Company

*v.*

## Central Garage.

*Demond, Woodworth, Sulloway & Rogers (Mr. Demond* orally), for the plaintiff.

*Donald Knowlton,* (by brief and orally), for the defendants.

BRANCH, J. The course pursued by the plaintiff in attempting to secure a decision upon the question of its duty to defend the suits which have been brought against the defendants in advance of their trial is undoubtedly correct. "Ordinarily, and in the absence of agreement of the parties, the issue is one calling for preliminary presentation, so that the insurer's right or duty to defend the action for negligence may be first determined." *Sauriolle* v. *O'Gorman, ante,* 39, 49. The declaratory judgment act (Laws 1929, *c.* 86) provides a convenient procedure for determining such a question, and the present petition is properly brought thereunder.

The first question transferred by the superior court reads as follows:

"1. Whether or not under the law of the State of New Hampshire an insurance company can from its home office outside of the State of New Hampshire, cancel an insurance policy by sending notice direct to the insured instead of through a resident licensed agent."

This question arises by reason of the following provisions of the statute relating to foreign insurance companies and their agents.

"LICENSES. If the foregoing provisions are complied with and the commissioner is satisfied that the company has the requisite capital and assets and is a safe, reliable company, entitled to confidence, he shall grant a license to it to do insurance business by authorized agents within the state, subject to the laws of the state, until April first thereafter . . . ." P. L., *c.* 275, *s.* 11.

The position of the defendants with reference to the effect of the foregoing provision is thus stated in their brief. "This is plainly a condition imposed by the legislature that the foreign insurance company shall be granted a license in this State to do business only by its authorized agents within the State . . . In sending out its notices of cancellation directly from the home office to the defendants, the company was not doing business *'by its authorized agents within the State'* . . . . The plaintiff's act then was unlawful and the courts only afford relief out of lawful transactions."

Both of the policies in question contained provisions that notice of cancellation mailed to the address of the assured should be a sufficient

notice on the part of the company. The defendants argue that these provisions are in conflict with the statute and for that reason nugatory.

The section of the statute above quoted had its origin in Laws of 1870, *c*. 1, *s*. 3, which provided, first, that no foreign insurance company should "transact any insurance business in this state" unless it should first obtain a license from the insurance commissioner; second, that after the insurance commissioner was satisfied that the requirements of the statute had been complied with by a foreign insurance company, he should issue a license "authorizing such company to do insurance business by authorized agents, subject to the laws of this state." This language was retained without change in G. L., *c*. 174, *s*. 2 and Laws of 1889, *c*. 86, *s*. 1. Obviously the purpose of the legislature was to permit the transaction, under a license, of the business which foreign insurance companies were forbidden to do without a license, viz. "insurance business in this state."

In the revision of 1891, the statutory provisions relating to foreign insurance companies were re-arranged and the long sections of the General Laws were replaced by a larger number of comparatively shorter sections in *c*. 169 of the Public Statutes. The first provision of Laws of 1870, *c*. 1, *s*. 3, above referred to, became section 1 of P. S., *c*. 169, in the following form. "Section 1. No insurance company not organized under the laws of this state shall do insurance business within the state unless it has obtained a license from the insurance commissioner authorizing it to do so."

The second provision above referred to, concerning the issuance of licenses, became section 6 of the same chapter, which provides that if the provisions of the preceding sections have been complied with and the insurance commissioner is satisfied that the company is entitled to confidence, "he shall grant a license to it to do insurance business by authorized agents *within the state*, subject to the laws of the state." (Italics ours.) All the language of the Public Statutes above quoted was retained in the revision of 1926. P. L., *c*. 275, *ss*. 1 and 11.

The prohibition against the transaction of "any insurance business in this state" having been separated in the Public Statutes from the provision authorizing the issuance of a license by four intermediate sections, the words "within the state" were apparently inserted after the word "agents" in the sixth section above referred to, not for the purpose of changing the existing law, but to avoid the seeming absurdity of directing the insurance commissioner to grant licenses to foreign insurance companies "to do insurance business by authorized

agents" which it must be assumed they were already authorized to do by the laws of the states in which they were incorporated. The conclusion that no material change in the law was intended is supported by the notation in the margin of the Commissioners' Report of 1891, indicating that only verbal changes were suggested in section 6. Comm'rs Rep. 1891, 546-48. The meaning of this section, like that of the statute of 1870, is that the company shall be licensed to do insurance business within the state, by authorized agents.

It is true that subsequent sections of the same chapter relating to the licensing of agents do, in effect, require that certain transactions be carried out only through the medium of local agents. P. L., c. 275, ss. 15-19. It seems unnecessary to analyze in detail the provisions of these sections. It is sufficient to say that their net effect is to require that foreign insurance companies act through local agents in "negotiating for or placing risks, or delivering policies or collecting premiums." P. L., c. 275, s. 17. Such an enumeration of acts which must be done through local agents negatives the argument that section 11 requires all acts affecting the business of foreign insurance companies in this state to be done by such agents. There is nothing in the statute which prohibits other transactions between such companies and their policy holders through other authorized agents. The contention of the plaintiff that the vice-president of a foreign insurance company cannot legally write and send through the mail a letter to one of its policy holders, would reduce the statute to an absurdity. We therefore conclude that P. L., c. 275, s. 11, does not demand that a foreign insurance company shall, as a condition of its license, transact all its business in this state through local licensed agents; nor is the giving of notice of cancellation one of the things required to be done by such agents.

The second question submitted to us for decision by the superior court is as follows:

"2. Whether or not the Insurance Commissioner's report, decision and findings made by authority of P. L. Ch. 271, as amended by Ch. 167 of the laws of 1931, have the effect of a binding judgment, and conclusively determine that the said insurance policies remained in force to March 6, 1932, the expiration date, and whether or not said report or decision is admissible in any litigation between the plaintiff and the defendant upon the question of whether or not the insurance policies were legally cancelled or remained in force to March 6, 1932."

The statute under which the insurance commissioner proceeded reads as follows: "12-a. Investigations Authorized. The insurance

commissioner, upon written complaint of any person holding a policy in any surety or insurance company doing business within this state that he is aggrieved by any act of such company, shall cause such investigation to be made of such complaint as he may deem necessary. Said commissioner may hold a public hearing, if he deems it advisable, after giving reasonable notice to the company and persons involved. 12-b. Findings. After the investigation the commissioner shall, within thirty days, make known his findings to all persons involved." Laws 1931, c. 167.

With reference to the above question, the defendants take the following position: "The Commissioner's findings are a judicial determination of the facts and the decision on the general merits is final. It is *res judicata* or estoppel by verdict."

In thus stating their position, the defendants correctly assume that the findings of the commissioner are not binding upon anybody in subsequent legal proceedings unless they constitute "a judicial determination of the facts." "The validity of a judgment as a bar or estoppel depends primarily upon the organization and character of the tribunal from which it professes to emanate. And it is first of all requisite that the judgment should have been rendered by a legally constituted court,—one known to and recognized by the law." 2 Black, Judgments, (2d. *ed.*) s. 516. *State* v. *Corron*, 73 N. H. 434.

The office of insurance commissioner was created solely by statute, and the holder of that office has only such powers as have been given to him by statute. He has been clothed with authority to conduct investigations and make findings. His findings are to be given the effect which the legislature intended them to have. The question for decision is, therefore, primarily one of statutory construction. *State* v. *Corron, supra,* 445. Did the legislature intend that the insurance commissioner, when conducting investigations under the act of 1931, should sit as a court for the adjudication of private rights and that his reports should conclusively establish the facts found by him with reference to all subsequent legal proceedings between the policy holders and the companies concerning which they were made? Both the language and the history of the act indicate that this question must be answered in the negative.

Obviously the act of 1931 does not, in terms, provide for a trial and final adjudication by the commissioner of private rights between insurance companies and their policy holders. If it had been the purpose of the legislature to confer upon the commissioner power to try cases and render final judgments therein, it is almost inconceivable

that language clearly expressive of that purpose would not have been used. There is nothing in the language of the statute which requires that the proceedings before the insurance commissioner shall be judicial in character. On the contrary, it contemplates an entirely different kind of proceeding, *i.e.* an administrative investigation as distinct from a judicial hearing, which is designed to eventuate in findings of fact rather than in a judgment establishing legal rights.

Under the constitutional guaranty of due process of law, private rights cannot be adjudicated unless notice and an opportunity to be heard is given to all having a legal interest in the subject-matter of the judgment. These are the essential requisites of a judicial proceeding. *Metcalf* v. *Gilmore*, 63 N. H. 174, 188. The present statute does not guarantee to a company against which a complaint is made any notice or hearing. The commissioner is only required to "cause such investigation to be made . . . as he may deem necessary." The fact that the commissioner was thus given authority to make findings with or without a hearing indicates that the legislature, by the act of 1931, did not intend to confer judicial authority upon him. Under these circumstances the giving of notice and the holding of a hearing in the course of a particular investigation cannot be effective to change the character of a proceeding under this act from that of an administrative investigation to that of a judicial hearing resulting in a final judgment. With reference to investigations and findings which are legislative in their character and purpose, the law has been thus declared by the highest constitutional authority. *Prentis* v. *Atlantic Coast Line*, 211 U. S. 210, 227.

It is, of course, true that a single tribunal or officer may exercise both administrative and judicial powers. *State* v. *Corron, supra*, 455. The authority of the insurance commissioner partakes of this dual character. In passing upon applications for licenses, the commissioner acts in a judicial capacity (*State v. Stevens*, 78 N. H. 268, 270), and this instance illustrates the distinction between his executive and judicial functions. When a license is granted, refused or revoked, the commissioner promulgates a real judgment which establishes the legal rights of the petitioner and is not open to collateral attack, although errors of law committed by the commissioner may be corrected upon *certiorari*. *State* v. *Stevens, supra*. The distinction between a judgment and mere findings of fact is well understood in our law. Such findings may, in the proper case, furnish the basis upon which a judgment may be rendered, but do not in themselves constitute an adjudication of rights. "Again, the judgment must be definitive. It

must purport to be the actual and absolute sentence of the law, as distinguished from a mere finding that one of the parties is entitled to a judgment, or from a direction to the effect that a judgment may be entered." 1 Black, Judgments, (2d *ed.*) *s.* 3.

By the act in question the insurance commissioner is given authority only to make "findings." Power to enter binding judgments in accordance with those findings has not been granted. His disability in this respect is similar to that under which the public service commission labors. *State* v. *Company, ante,* 16, 28-33. Here, again, if the legislature had intended that the findings of the commissioner should have the characteristic of finality it is incredible that language appropriate to accomplish that purpose would not have been used, as in the fence-viewers statute, which provides that a decision of duly qualified fence-viewers "shall be final and conclusive upon the parties." P. L., *c.* 219, *s.* 19.

There is no room for the argument that the findings of the commissioner in cases like the one at bar will be futile unless they be given effect as final judgments between the parties. Such findings may serve a useful purpose, either (1), by furnishing a basis for the amicable adjustment of controversies between insurance companies and their policy holders; or (2) by informing the commissioner whether the practices of the company are such as to entitle it to public confidence, without which it is not entitled to a license. P. L., *c.* 275, *s.* 11; or (3) by furnishing a basis for a report by the commissioner to the attorney-general if he finds that the law has been violated. P. L., *c.* 275, *s.* 26.

As the result of the foregoing considerations and others of a similar nature, it may be stated as a general rule that when the legislature makes provision for investigations and findings by public officers without providing in terms for the finality of such findings, it will not be assumed that such findings conclude any interested party in subsequent judicial proceedings.

There is nothing in the conclusion here reached which conflicts with the decision in the case of *State* v. *Corron, supra.* There the court was concerned solely with the construction of the liquor law. The problem for solution was thus stated on the first page of the opinion. "The question, therefore, is merely what was meant by the language of the act read in the light of the surrounding circumstances and existing law." *State* v. *Corron, supra,* 445. As ever in such cases the problem was solved by an ascertainment of the legislative intent. The question being thus restricted, the reasoning of the court was equally

specific, and no general conclusions applicable to the construction of other statutes were announced in the opinion.

It was there held that the statute regulating the sale of intoxicating liquor authorized the license commission to revoke licenses by either administrative or judicial action. The general provision was for judicial action to be taken only after notice and hearing. Summary administrative action was permitted only as to one class of licenses, and was specifically stated to be an exception. The proceedings of the commission were designed to be normally of a judicial character, and power to produce a positive result, namely the revocation of a license, was indisputably conferred upon it. In other words, it was explicitly empowered to take action of a kind which finally determined the legal rights of the licensee and effected a change in his status.

In the present instance, as pointed out above, the statute provides merely for an "investigation." Notice and hearing are never required. The proceedings of the commissioner are designed to be purely administrative, and no purpose to authorize a judicial determination of legal rights or a change of status is expressed. These statutory differences are sufficient to show that the extreme conclusion reached in the earlier case is not required by the provisions of the statute here involved.

We think that a sufficient basis for our conclusion has already been indicated, but it finds additional confirmation in the history of the act of 1931. The history of legislation and the circumstances under which it was passed are properly considered in connection with the words of the statute in order to ascertain the intention of the legislature. *State* v. *Railroad*, 76 N. H. 146, 149; *Stanyan* v. *Peterborough*, 69 N. H. 372, 373.

The act in question appears to have had its origin in house bill No. 62 of the session of 1931, entitled, "An Act Extending the Powers of the Insurance Commissioner." This bill provided that upon the complaint of any policy holder in an insurance company, except a life or fire insurance company, the insurance commissioner might, if he deemed it advisable, fix a date for a hearing upon the complaint, that he should give written notice of such hearing to the company against which the complaint was made, at least fourteen days before the date set for hearing and that after the hearing he should make his findings and seasonably notify all parties thereof. The purposes which such findings were designed to serve were indicated by the following provision.

"15d. *Use of Findings.* Commissioner may use his findings made upon such complaint, so far as pertinent, as bearing upon the financial condition of the company, its ability to fufill its obligations, whether it has complied with the law and the equity of its dealings with its policy holders, in determining whether the company is safe, reliable and entitled to confidence."

It is to be noted that this proposed act contained no provision that the findings of the commissioner should be final or that he should make any order or enter any judgment between the parties in accordance therewith.

This bill, having passed the house, was referred by the senate to its judiciary committee and the majority of that committee subsequently reported favorably a new draft which was, in fact, a radically different measure. This bill made the assistant attorney-general, the commissioner of motor vehicles and the insurance commissioner a joint board of adjustment to pass upon small claims for property damage not exceeding $250 caused by the negligent operation of automobiles, and proposed to enforce the new tribunal's decisions against insurance companies by making persistent refusal to comply therewith a ground for forfeiting of their licenses. This bill failed of passage in the senate. Finally the present act known as senate bill No. 104, was introduced by the senate judiciary committee and passed both houses without amendment.

It, therefore, appears that in none of the proposed legislation was any attempt made to give the insurance commissioner general authority to adjudicate disputes between insurance companies and their policy holders and that the attempt to give limited authority of this kind to a board of which the insurance commissioner was to be a member, met with defeat. The conclusion is plain that it was not the purpose of the legislature to give to the insurance commissioner by the act of 1931, power to sit as a court for the trial of controversies between insurance companies and their policy holders.

In view of this result, the constitutional aspect of possible legislation designed to make the commissioner a court has not been considered.

Since the findings of the commissioner do not conclude the parties, his report is not admissible as evidence of the facts found. The conclusions of fact of one tribunal cannot be used to influence another tribunal having a similar question before it. *Elwell* v. *Roper*, 72 N. H. 254, 257; *Arlington Mills* v. *Salem*, 83 N. H. 148, 159.

All concurred.

*Case discharged.*